# Richmond.

## J. R. NICHOLS, ET AL. V. CENTRAL VIRGINIA POWER COMPANY, ET AL.

### November 12, 1925.

1. INJUNCTIONS—*Dissolution of Injunction Granted by a Judge of the Supreme Court of Appeals by the Lower Court, or the Judge Thereof in Vacation.*—While an injunction awarded by one of the judges of the Supreme Court of Appeals, under sections 6320 and 6321 of the Code of 1919, is not to be precipitately dissolved, yet under the authority granted by section 6317 of the Code of 1919 the circuit court, or the judge thereof in vacation, after reasonable notice, has the unquestioned power to dissolve an injunction granted by one of the judges of the Supreme Court of Appeals, who acts, not in an appellate capacity, but as a judge of another court of co-ordinate jurisdiction.

2. EMINENT DOMAIN—*Injunction Against Taking Property—Adequate Remedy at Law.*—An entry upon private property under color of the eminent domain power will be enjoined until the right to make such entry has been perfected by a full compliance with the Constitution and the laws. A private person who applies for an injunction to restrain a public corporation or body of functionaries from entering illegally on his land is not required to make out a case of destructive trespass or irreparable damage. Injunction will lie to restrain the condemnation of private property for private use.

3. EMINENT DOMAIN—*Public or Private Use—Charter Provision that Company is a Public Service Corporation.*—Regardless of the charter provisions of a company that it is a public service corporation, it is the province of the appellate court to determine the question in the particular case, whethe the use is public or private, for which the land is sought to be taken.

4. EMINENT DOMAIN—*Public Use—Definition.*—A use to be public must be fixed and definite. It must be one in which the public, as such, has an interest, and the terms and manner of its enjoyment must be within the contro' of the State, independent of the rights of the private owner of the property appropriated to the use. The use of property cannot be said to be public if t can be gainsaid, denied, or withdrawn by the owner. The public interest must dominate the private gain.

5. EMINENT DOMAIN—*Public Use—What Constitutes—General Prosperity of the Community.*—It will not suffice 'f the general prosperity of the community is promoted by the taking of private property from the owner and transferring it title and control to a corporation, to be used by such corporation as its private property uncontrolled by law, as to its use. On the other hand, whenever the public use of property requires it, the private rights of property must yield to this paramount right of sovereign power to take it for the public use.

6. EMINENT DOMAIN—*Public Use—Public and Private Use Blended.*—It is difficult at times to observe the line of demarcation between private benefit and public use. When the two are thus blended, the judicial practice is to approve the undertaking if it is capable of furthering a public use, and disregard the private benefit as a mere incident.

7. EMINENT DOMAIN—*Public and Private Use—Power Company—Case at Bar.*—In the instant case, a bil' to enjoin a power company from condemning the lands of complainants, the bill alleged that the property was wanted for private use, and not for public use. The line was being constructed from a point near Roanoke to a point near Lynchburg for the purpose, among others, of supply'ng the Lynchburg Traction Company with power, but the defendant would sell all of the electric power it possibly could to whomsoever might apply, at rates to be prescribed by the Corporation Commission.

   *Held·* That the purpose of the power company in constructing the line was a public purpose.

8. EMINENT DOMAIN—*Public Use—Right to Withdraw from the Public Use.*—Where the charter of a company conferred upon it the right to withdraw from the public use its entire manufactured products and appropriate the same to its own use or benefit, the private benefit clearly dominated the public interest, and the exercise of the power of eminent domain by the corporation would be illegal.

9. EMINENT DOMAIN—*Public Use—Electricity—Furnishing Power to Another Company—Case at Bar.*—The furnishing of electric power by a duly incorporated company, without reservation of private benefit, to a public· service corporation, which in turn furnishes the same electric power to the public, is a public use, and the corporation is invested with the power of eminent domain.

Appeal from a decree of the Circuit Court of Bedford county. Decree for defendant. Complainants appeal.

*Affirmed.*

The opinion states the case.

*S. S. Lambeth, Jr.*, for the appellant.

*Woods, Chitwood, Coxe & Rogers, Landon Lowry,* and *Barksdale & Abbot*, for the appellees.

Campbell, J., delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of Bedford county, refusing to grant the prayer of the bill of complaint of appellants, wherein it was sought to restrain and enjoin the appellees from condemning the lands of appellants for alleged public use or public purpose.

Being unable to agree with appellants on the terms of purchase of the lands wanted for the purposes of appellee, it filed its petition against the appellants, alleging therein—

" * * * that it was a public service corporation, chartered and existing under the laws of Virginia, and was authorized to exercise the power of eminent domain; that it was engaged in constructing, and proposed to operate, a power line between substations near Roanoke and Lynchburg at which substations electricity would be procured for transmission, sale or distribution; that the power line between those points had been duly decided on and its proper officers directed to acquire the necessary right of way, which passed over the property of the appellants and which could not be purchased.

"That its object in constructing said line was to transmit or supply electricity between the above-mentioned points for distribution thereof in Roanoke and Lynchburg, the adjacent territory, the intervening

territory wherever practicable, as well as to other territory in the State of Virginia; that the right of way over the property was wanted for the use and purpose of erecting said power line and maintaining and operating it, along and over which electricity would be transmitted between the above mentioned points:

"That the necessity for the work was to enable the power company to properly perform its public duties, to meet the increasing demand of the public for electric service in the communities to be served by it; that at certain seasons of the year the hydro-electric generating plant at Reusens, belonging to the Lynchburg Traction and Light Company, had an excess of power which had to be wasted; that the transmission line would enable that wastage to be utilized in Roanoke and elsewhere; that at certain seasons of the year, especially during seasons of low or extremely high water in James river, electricity would be transmitted from the substation near Roanoke for distribution to the consumers in Lynchburg and vicinities where there was at such seasons a threatened shortage.

"That a *bona fide* but ineffectual effort to acquire the right of way had been made."

There was a demurrer and motion to quash the petition, both of which were overruled; thereupon, an answer was filed denying all the allegations of the petition and charging that the right of way sought to be condemned was not wanted for public use but for private purposes.

Among the provisions contained in the charter of the company is the following: "That it shall have the right to exercise the power of eminent domain."

After hearing evidence, the court entered an order reciting that the company was a public service cor-

poration and was authorized to condemn land wanted for its purposes and uses. The motion of the appellants to suspend the operation of the order was overruled, and, thereupon, the appellants presented their bill for injunction to the judge of the circuit court, which was refused.

On the 11th of July, 1925, the bill praying for an injunction was presented to one of the judges of the Supreme Court of Appeals.

Upon an *ex parte* hearing an injunction was granted, restraining the further prosecution of the condemnation proceedings by the company, effective for ninety days, unless sooner dissolved or enlarged. On the 14th of July, the company gave notice to the appellants that it would, on the 17th of July, move the circuit court to dissolve the injunction granted by a judge of this court.

On the 29th day of July, the trial court entered the following order:

"This cause came on this day pursuant to the order of July 17, 1925, in vacation of the court, on the papers formerly read, the order entered in vacation in this cause on the 17th day of July, 1925, and was argued by counsel; and the court now, after maturely considering the matter, being of the opinion that the plaintiffs have a full, adequate and complete remedy at law in the condemnation proceedings as decided in the case of *South & Western Ry. Co. of Virginia* v. *Virginia & Southwestern Ry. Co.*, 104 Va. 323, 51 S. E. 843, that the injunction heretofore granted in this cause on the 11th day of July, 1925, without notice to the defendant, was improvidently awarded; that the judge of this court in vacation has full and plenary authority under section 6317, Code of Virginia 1919, as amended, in vacation to dissolve the said injunction

after a hearing on the bill of complaint and motion to dissolve; that the bill does not show any probable cause from which this court may reasonably infer that the plaintiffs will be able to make out a case for injunction on final hearing;

"It is adjudged, ordered and decreed that the injunction heretofore awarded in this case on the 11th day of July, 1925, and entered in the clerk's office of this court on the 13th day of July, 1925, be, and it hereby is, dissolved, annulled and set aside."

From that decree an appeal and supersedeas was awarded.

The first assignment of error relied on by the appellant is that the circuit court had no power to dissolve the injunction granted by a judge of the Supreme Court of Appeals. Section 6320 of the Code of 1919 provides that when the circuit court, or the judge thereof, shall refuse to award an injunction, or shall dissolve an injunction, then the papers presented to the judge in vacation may be presented to a judge of the Supreme Court of Appeals, who may thereupon either award an injunction or reinstate the injunction dissolved.

Section 6321 of Code, 1919 provides that the order awarding the injunction shall be directed to the clerk of the court having jurisdiction of the cause, and the proceedings thereupon shall be as if the order had been made by such court.

Section 6317 of Code, 1919, as amended by Acts 1922, chapter 445, deals with the question of awarding and dissolving injunctions in certain cases, and then provides: "And any such court, in which a cause is pending, or to which, or to the judge of which, a bill is addressed, wherein an injunction has been awarded, or the judge of such court, in vacation, may at any time when such injunction is in force, dissolve the

same, after reasonable notice to the adverse party, or to his attorney at law or in fact," etc.

This precise question has been heretofore passed upon by this tribunal in *Wilder* v. *Kelley, Judge*, 88 Va. 274, 13 S. E. 483. The opinion handed down by a majority of the court held that the judge of the Circuit Court of Washington county did not have the power to dissolve an injunction awarded by Honorable Robert A. Richardson, one of the judges of the Supreme Court of Appeals, and awarded a writ of mandamus to compel Judge Kelley to enforce the order of Judge Richardson. The majority opinion cites with approval the case of *Toll Bridge* v. *Free Bridge*, 1 Rand. (22 Va.) 206, which held that a decree of the lower court dissolving an injunction granted by two judges of the appellate court was erroneous. In a dissenting opinion, concurred in by Fauntleroy, J., Lewis, P., said: "The idea that in making the order, Judge Richardson was exercising an appellate power, is, I think, a mistaken view. When a judge of this court awards an injunction, he exercises a special original jurisdiction with which he is clothed by the statute. In all events, his act, when completed, is as if the order had been made by an inferior judge of court; nothing more. The statute upon this point seems to me too plain to be misunderstood.

"And here it is pertinent to inquire: If the circuit court or judge, to whose clerk an order awarding an injunction by a judge of this court is directed, has no discretion respecting it, but must literally enforce it, as a ministerial duty, how is such an order to be dissolved or gotten rid of at all? Are the parties aggrieved by it remediless until a final or other appealable decree has been entered? Could that have been the intention of the legislature? And yet, such is the case if the theory of the majority of the court be correct."

Dr. Lile, in a footnote to section 364 of the second edition of his Equity Pleading & Practice, says:

"Section 6321.   The effect of this statute was the subject of a somewhat acrimonious discussion by the majority and minority of the judges in *Wilder* v. *Kelley*, 88 Va. 274, 13 S. E. 483.   The dissenting opinion of Lewis, P., (concurred in by Fauntleroy, J.) seems the only possible interpretation, viz., that when the appellate judge grants the injunction, he acts not in an appellate capacity, but as a judge of another court of co-ordinate jurisdiction, and, therefore, the preliminary injunction so awarded may be dissolved by the judge of the lower court, on the preliminary motion in vacation.   This seems plain from the language of the statute."

In obedience to the mandate of the appellate court, Judge Kelley proceeded to enforce the order thereof. However, from a decree carrying into effect the order entered, an appeal was allowed, the injunction awarded was dissolved, and the mandamus proceedings were dismissed.   *Va. & Tenn., etc., Co.* v. *Wilder, etc.*, 88 Va. 942, 14 S. E. 806.

[1] While we assume that an injunction awarded by one of the judges of the Court of Appeals, after due hearing upon notice, will not be precipitately dissolved, we are of the opinion that, under the authority granted by section 6317 of the Code, the circuit court, or the judge thereof in vacation, after reasonable notice, has the unquestioned power to dissolve an injunction granted by one of the judges of the Supreme Court of Appeals, who acts, not in an appellate capacity, but as a judge of another court of co-ordinate jurisdiction. To the extent that the cases of *Toll Bridge* v. *Free Bridge* and *Wilder* v. *Kelley, Judge, supra*, are in conflict with the view herein expressed, they are overruled.

The next assignment of error is as follows: "Petitioners are advised that the learned circuit court erred in refusing to enjoin and restrain the further prosecution of the aforesaid condemnation proceedings by said Central Virginia Power Company, on the ground that it appeared from said proceedings and from the evidence therein, filed as an exhibit with the injunction bill, that petitioners' property was wanted for said power company's private use, and not for public use. And that, therefore, the taking of said property for private use was unlawful, and in violation of the Constitution and laws of Virginia, and of the fourteenth amendment to the Constitution of the United States."

Under this assignment of error, the question arises: If the taking of the land of appellants is unlawful, is injunction the proper remedy?

[2, 3] Upon the part of the company it is contended that there is no suggestion of fraud or mistake in the bill; that there is no question of irreparable damages; that, under the condemnation statutes, the appellants have a full, adequate and complete remedy at law, and an injunction will not lie.

In Lewis on Eminent Domain (2d ed.), section 633, it is said: "It is now almost universally held that an entry upon private property under color of the eminent domain power will be enjoined until the right to make such entry has been perfected by a full compliance with the Constitution and the laws."

In *Osborne & Company* v. *Missouri P. Ry. Co.*, 147 U. S. 248, 13 S. Ct. 299, 37 L. Ed. 155, it is said: "Equitable jurisdiction may be involved in view of the inadequacy of the legal remedy where the injury is destructive or of a continuous character, or irreparable in its nature; and the appropriation of private property to public use under color of law, but in fact

without authority, is such an invasion of private rights as may be assumed to be essentially irremediable if, indeed, relief may not be awarded *ex debito justitiae.*"

In *Manchester Cotton Mills* v. *Manchester*, 25 Gratt. (66 Va.) 828, Judge Staples said: "It is said by an eminent author that a private person who applies for an injunction to restrain a public incorporated company or body of functionaries from entering illegally on his land is not required to make out a case of destructive trespass or irreparable damage.

"The tendency of such bodies to act oftentimes in an arbitrary manner, and the inability of private persons to contend with them, it is said raises an equity for the proper interference of the court wherever there is the slightest excess of power. The general spirit of the later cases is, therefore, to favor a relaxation rather than the strict application of the rule, which denies the right to resort to equity when there is a remedy at law."

And again, on page 730, Judge Staples continues: "It is no answer to him to say that for the appropriation of his lot he may recover in ejectment, and for the destruction of his valuable building he may recover in damages. Universal experience demonstrates how ineffectual such a remedy is to afford a just compensation, especially in controversies with a corporation backed by all the appliances of wealth and the influence of public sentiment."

See also *Williamette* v. *Oregon*, 26 Or. 224, 37 P. 1016, 29 L. R. A. 88, 46 Am. St. Rep. 620.

In the *Oregon School Law Case*, U. S. 45 Sup. Ct. 571, 69 L. Ed. 1070, it is said: "Prevention of impending injury by unlawful action is a well recognized function of courts of equity."

Under the provisions of section 4371 of the Code of

1919, the company, on paying into court the sum ascertained by the commissioners appointed to award damages, may, notwithstanding the pendency of proceedings, enter into and construct its work upon or through that part of the land sought to be condemned.

It is further provided in this section that no injunction shall be awarded to stay the proceedings of the company in the prosecution of its work, unless the officers, servants, or agents, are transcending their authority.

If, therefore, the trial court has erred in its judgment that the use for which the land is sought to be condemned is a public use, then it follows as a corollary that the company is transcending its authority and injunction will lie to restrain the condemnation of private property for private use. Regardless of the charter provisions of a company that it is a public service corporation, it is the province of the appellate court to determine the question in the particular case, whether the use is public or private, for which the land is sought to be taken.

As to what constitutes a public use under the condemnation laws, without multiplying citations, we are content to refer to the able and comprehensive opinion of Judge Cardwell in *Fallsburg, etc., Co. v. Alexander*, 101 Va. 98, 43 S. E. 194, 61 L. R. A. 129, 99 Am. St. Rep. 855. In the syllabus to the case, prepared by Judge Burks, it is stated:

[4] "A use to be public must be fixed and definite. It must be one in which the public, as such, has an interest, and the terms and manner of its enjoyment must be within the control of the State, independent of the rights of the private owner of the property appropriated to the use. The use of property cannot be said to be public if it can be gainsaid, denied, or

withdrawn by the owner. The public interest must dominate the private gain."

"The mere recognition. of the corporation in its charter as an 'internal improvement company' does not make it so, and bring it within the operation of the general laws of the State governing such companies and controlling their operation." *Fallsburg Case, supra.*

[5] In order to constitute the appellee a public service corporation and invest it with the power of eminent domain, it must meet the requirements imposed upon it.

"It will not suffice if the general prosperity of the community is promoted by the taking of private property from the owner and transferring its title and control to a corporation, to be used by such corporation as its private property, uncontrolled by law as to its use." *Gilmer v. Lime Point,* 18 Cal. 229.

On the other hand, as said in the *Fallsburg Case,* "whenever the public use of property requires it, the private rights of property must yield to this paramount right of sovereign power to take it for the public use."

[6] It is difficult at times to observe the line of demarcation between private benefit and public use. When the two are thus so blended, "the judicial practice in such cases is to approve the undertaking if it is capable of furthering a public use, and disregard the private benefit as a mere incident." *Plecker v. Rhodes,* 30 Gratt. (71 Va.) 798.

[7] The facts in the case at bar are few. It appears that the line is being constructed from a point near Roanoke to a point near Lynchburg for the purpose, among others, to supply the Lynchburg Traction and Light Company with power; that the Power Company will sell all of the electric power it possibly can to

whomsoever may apply, at rates to be prescribed by the Corporation Commission. Therefore, the dominant question to be here considered is whether or not the power granted by statute to the company, to exercise the right of eminent domain, is violative of the Constitution. To sustain their contention that the right conferred is contrary to the Constitution of the State, appellants rely on the *Fallsburg Case, supra.*

[8] We do not so interpret that case. The gist of the holding was that the charter of the Fallsburg Company conferred upon it the right to withdraw from the public use its entire manufactured products and appropriate the same to its own use or benefit. This, of course, was held to be illegal as the private benefit clearly dominated the public interest. In concluding its opinion the court said:

"We do not mean to say, however, that under no conditions can the rights of eminent domain be conferred by the legislature in furtherance of the establishment of plants for the generation of electric power, or other power, light or heat, where public necessity requires it, and the public use or benefit is apparent and safely guarded. To meet industrial progress, new conditions and the ever increasing necessity of society, the courts have gone very far in sustaining legislation concerning the franchise of eminent domain, and it is not necessary for us, in this case, if we were so inclined, to question the soundness of the policy sustained in those decisions."

That conditions have changed since the organization of the government must be recognized, and while we do not mean "to sacrifice principle on the altar of progress," as appellants claim is sought to be done, we are of the opinion that, under the exigencies of modern conditions, the public demand for electric

14

current—now one of the necessities ·of life—should be fully met, if, as in this case, the use is public, and the rights of the citizen are safely guarded by the supervision of the Corporation Commission.

[9] We are, therefore, of the further opinion that the furnishing of electric power by a duly incorporated company, without reservation of private benefit, to a public service corporation, which in turn furnishes the same electric power to the public, is a public use and that the corporation is invested with the power of eminent domain.

That this holding is in keeping with the trend of modern decisions is evidenced by the following authorities:

In 20 C. J., section 68, it is said: "A corporation organized to generate and furnish electric power may exercise the right of eminent domain, although it does not render service directly to the public but indirectly through other persons and corporations."

In *Washington, ex rel., etc.* v. *Superior Court*, 52 Wash. 196, 100 Pac. 317, 21 L. R. A. (N. S.) 448, it is said: "Does the fact that the respondent will sell and deliver a portion of its electrical energy to third persons and corporations, to be by them used for public and municipal lighting, and in the operation of railroads and railways, afford a sufficient reason for denying to it the right of eminent domain? We think not. The courts look to the substance rather than to the form; to the end rather than to the means. If in the end the property is devoted to a public use, the mere agency or instrumentality through which that result is accomplished is a matter of no concern."

In *Washington Water Power Co.* v. *Waters* (C. C.) 186 Fed. 572, it is said: "The further question is raised that the plaintiff is not a public service cor-

poration, the point being that it does not render a
service directly to the public, but in the main furnishes
power and electricity for distribution to the consumer
by other persons and corporations. I do not deem it
essential to an understanding of the rule, that the
facts be here stated, or that the principle of law be dis-
cussed at length. The objection is, I think, not well
taken." See also *Nolan* v. *Central Georgia Power
Co.*, 134 Ga. 201, 67 S. E. 656; *Miller* v. *Southern
Indiana Power Co.*, 184 Ind. 370, 111 N. E. 308.

In the leading case of *Mt. Vernon Cotton Co.* v.
*Alabama Power Co.*, 240 U. S. 32, 36 S. Ct. 234, 60
L. Ed. 507, Mr. Justice Holmes, delivering the opinion
of the court, said: "The principal argument presented
that is open here is that the purpose of the condemna-
tion is not a public one.

"The purpose of the Power Company's incorporation
and that for which it seeks to condemn property of the
plaintiff in error is to manufacture, supply and sell
to the public power produced by water as a motive
force. In the organic relations of modern society it
may sometimes be hard to draw the line that is supposed
to limit the authority of the legislature to exercise or
delegate the power of eminent domain. But to gather
the streams from waste, and to draw from them energy,
labor without brains, and so to save mankind from
toil that it can be spared, is to supply what, next to
intellect, is the very foundation of all our achievements
and all our welfare. If that purpose is not public, we
should be at a loss to say what is. The inadequacy of
use by the general public as a universal test is estab-
lished."

Upon the whole case, the court is of the opinion
that there is no error in the decree appealed from, and
that it must be affirmed.

*Affirmed.*